# IN THE SUPREME COURT OF TEXAS

══════════
No. 14-0410
══════════

Sylvia Galvan, Petitioner,

v.

Memorial Hermann Hospital System, Respondent

═══════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas
═══════════════════════════════════════════════

**PER CURIAM**

At issue in this case is whether a visitor's claim against a hospital arising from a slip and fall inside the hospital is a health care liability claim under the Texas Medical Liability Act. *See* Tex. Civ. Prac. & Rem. Code ch. 74. Because the record does not demonstrate a substantive relationship between the safety standards the visitor alleges the hospital breached and the provision of health care, we conclude that the claim is not a health care liability claim. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

Sylvia Galvan sued Memorial Hermann Southwest Hospital, alleging that she was injured when she slipped on water on the floor. She alleged she was visiting a relative in the hospital and was walking from the pharmacy to her relative's room when she encountered the water coming from a restroom. The hospital filed a motion to dismiss, asserting that Galvan's claim was a health care

liability claim (HCLC)[1] and she failed to serve an expert report as required by the Texas Medical Liability Act (the Act). *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (b) (requiring dismissal of an HCLC if a claimant fails to timely serve an expert report). In its motion, the hospital cited *Texas West Oaks Hospital, L.P. v. Williams*, 371 S.W.3d 171, 186 (Tex. 2012), where we held that when a claimant asserts a safety standards-based claim against a health care provider, those standards need not be directly related to the provision of health care in order for the claim to be an HCLC under the Act. The hospital urged that Galvan's allegations fell within the common meaning of "safety" and her claim was therefore an HCLC.

The trial court denied the hospital's motion. The court of appeals reversed. 434 S.W.3d 176 (Tex. App.—Houston [14th Dist.] 2014). The appeals court interpreted *Williams* to mean that "health care liability claims based upon alleged departures from accepted safety standards must involve an alleged departure from standards for protection from danger, harm, or loss, but need not involve an alleged departure from standards that involve health care or are directly or indirectly related to health care." *Id.* at 181-82 (citing *Williams*, 371 S.W.3d at 183-86). Therefore, the court concluded, because Galvan's claim was based on an alleged departure from accepted standards of safety, it was an HCLC. *Id.* at 186.

---

[1] Under the Texas Medical Liability Act an HCLC is

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

After the court of appeals issued its opinion, we considered a factually and procedurally similar claim against a hospital. *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496 (Tex. 2015). In that case, Lezlea Ross, a hospital visitor, slipped and fell in the hospital lobby near the exit doors. *Id.* at 499. She did not file an expert report; the hospital moved for dismissal on the basis that Ross's claim was an HCLC; the trial court granted the motion; and the court of appeals affirmed. *Id.* We reversed, concluding that a safety standards-based claim against a health care provider is an HCLC only if there is a "substantive nexus" between the "safety standards allegedly violated and the provision of health care." *Id.* at 504. We set out the following non-exclusive considerations:

1. Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;
2. Did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special, medical care was implicated;
3. At the time of the injury was the claimant in the process of seeking or receiving health care;
4. At the time of the injury was the claimant providing or assisting in providing health care;
5. Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;
6. If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; or
7. Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

*Id.* at 505. Under the record in *Ross*, we concluded the answer to each of the considerations was "no." *Id.* Therefore, Ross's claim was based on safety standards that had no substantive relationship to the hospital's provision of health care, so it was not an HCLC. *Id.*

3

Galvan argues that our holding in *Ross* is dispositive. She asserts that her claim is based on safety standards that have *no* relationship—much less a *substantive* one—to the hospital's providing of medical or health care. The hospital asserts that the safety standards at issue have a substantive relationship to health care and patient safety because the purpose of those safety standards is to maintain infection control according to governmental and industry standards. Given the record before us, we agree with Galvan.

The hospital sets out four of the *Ross* factors that it claims are presented here: (1) the hospital's alleged negligence occurred in the course of performing tasks to protect patients from harm, (2) the injuries occurred in a place where patients might be during the time they were receiving care, (3) the alleged negligence was based on safety standards arising from professional duties owed by the hospital, and (4) the alleged negligence occurred in the course of the hospital's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies.

As for the hospital's claim that the injuries occurred in a place where patients might be when they were receiving care, the hospital argues that this injury occurred in a hallway and patients must regularly traverse the hallways on their way to hospital destinations. Patients can also be found, the hospital claims, wandering the hospital hallways while waiting for test results. Galvan's pleadings did not allege where the water was, other than that it was in a hallway; she argued in the court of appeals and argues in this Court that she fell in the hospital's main lobby. The record, however, contains no evidence of where Galvan fell. And nothing in the record supports the hospital's

4

contention that patients regularly—or even occasionally—traversed the area where Galvan fell, regardless of whether it was in the main lobby or a hallway.

In arguing that the other *Ross* factors apply, the hospital asserts that dealing with water coming from a restroom in a hospital setting requires compliance with numerous federal and state regulations that tie infection control to health care and patient safety. The hospital states that health care-associated infections pose a threat to all patients, many of whom are already susceptible to infection. Further, the hospital asserts that the hospital environment plays a significant role in maintaining patient safety and remaining in compliance with infection-control requirements.

The hospital points to multiple requirements that it asserts establish a substantive nexus between the gravamen of Galvan's claim—failing to remove water on the floor that posed a slip and fall hazard, or to warn of it—and the provision of health care. It posits that under federal regulations, hospitals accepting Medicare funds must meet certain standards, including providing a sanitary environment and having an active program for preventing, controlling, and investigating infections and communicable diseases. 42 C.F.R. § 482.1, .42. The hospital also refers to a guideline from the U.S. Department of Health and Human Services Centers for Disease Control and Prevention (CDC) that recommends the preferred methods for disinfecting and sterilizing medical devices and for cleaning and disinfecting health care facilities. U.S. DEP'T OF HEALTH AND HUMAN SERVS. CTRS. FOR DISEASE CONTROL AND PREVENTION, *Guideline for Disinfection and Sterilization in Healthcare Facilities* (2008) [hereinafter *CDC Guideline*]. The hospital asserts that according to the guideline, hospital floors are often contaminated and the guideline contains appropriate sanitation practices. The Agency for Healthcare Research and Quality also published a summary regarding health

care-associated infections stating that the transmission of pathogens is affected by effective cleaning and preventing contamination of surfaces. U.S. DEP'T OF HEALTH & HUMAN SERVS. AGENCY FOR HEALTHCARE RESEARCH & QUALITY, Pub'n No. 13-0053-EF, *Understanding the Role of Health Care Facility Design in the Acquisition and Prevention of HAIs* (2013). The hospital also points out that the Environmental Protection Agency encourages hospitals to use microfiber mops rather than conventional wet loop mops because the microfiber mops eliminate bacteria and microorganisms more efficiently and effectively. U.S. ENVTL. PROT. AGENCY, *Using Microfiber Mops in Hospitals* (Nov. 2002). Finally, the hospital points to State regulations requiring the Texas Board of Health to adopt and enforce rules addressing safety and sanitation requirements. TEX. HEALTH & SAFETY CODE § 241.026(a)(3).

The hospital states, despite the absence of evidence, that there "is no doubt infection control is applicable to the issue in this lawsuit involving a hospital hallway." Infection control in a hospital is related to the provision of health care. But the record here does not show that infection-control activities and regulatory mandates would have been the hospital's reason for cleaning the water from its floor for safety purposes. For example, the CDC guideline the hospital references states that contact with noncritical surfaces, which includes floors, carries little risk of causing an infection in patients or staff. *CDC Guideline* 29. However, the guideline specifies that surfaces contaminated with "blood and other potentially infectious materials" should be disinfected, and the guideline discusses the manner of applying disinfectants and lists chemical disinfectants and their uses. *Id.* at 11, 30, 38. And despite the hospital's logic, the record does not indicate that the water Galvan slipped on was a "potentially infectious material" or was in an area where it posed a hazard to

6

patients or persons seeking health care. Hospital standards for floor maintenance "may also be the same standards many businesses generally have for maintaining their floors." *Ross*, 462 S.W.3d at 503. Here, the record does not show that the hospital's duty regarding water on the floor implicated infection-control standards. *See id.* at 505 ("The pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's duties as a health care provider . . . .").

As for the other regulations and recommendations the hospital references that do not explicitly address infection control, such as recommendations that hospitals use microfiber mops rather than conventional wet loop mops and State regulations requiring the Texas Board of Health to adopt and enforce safety and sanitation rules, the record does not show that these have a substantive relationship to the safety standards underlying Galvan's claim. Galvan claimed that the hospital failed to clean up or warn her of the wet floor, regardless of the type of mop it used or whether the Texas Board of Health has adopted rules addressing safety and sanitation requirements.

Under the record in this case, no substantive nexus is shown to exist between the safety standards Galvan alleges the hospital violated and the provision of health care. *See id.* at 504 (providing that the fact that a visitor would not have been injured but for her falling inside a hospital is not a sufficient relationship between the standards allegedly violated and the provision of health care for the claim to be an HCLC).

We grant the petition for review. Without hearing oral argument, *see* TEX. R. APP. P. 59.1, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

**OPINION DELIVERED:** December 4, 2015

7